# IN THE SUPREME COURT OF CALIFORNIA

TAYLOR CAPITO,

Plaintiff and Appellant,

v.

SAN JOSE HEALTHCARE SYSTEM, LP,

Defendant and Respondent.

S280018

Sixth Appellate District
H049646

Santa Clara County Superior Court
20CV366981

December 23, 2024

Justice Liu authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Kruger, Groban, Jenkins, and Evans concurred.

CAPITO v. SAN JOSE HEALTHCARE SYSTEM, LP

S280018

Opinion of the Court by Liu, J.

An extensive scheme of state and federal law obligates hospitals to make specific disclosures about the prices of medical services, including fees for evaluation and management services (EMS) for emergency room patients. California's Payers' Bill of Rights (Health & Saf. Code, § 1339.50 et seq.) requires most hospitals in the state to publish online or at the hospital a "chargemaster" listing the uniform charges for its services. (See Health & Saf. Code, § 1339.51, subds. (a)(1), (b)(1); see also 42 U.S.C. § 300gg-18(e) [imposing similar requirements for Medicare participating hospitals].) The state law also requires hospitals to "post a clear and conspicuous notice in its emergency department" informing patients that the chargemaster is available for review and how it may be accessed. (Health & Saf. Code, § 1339.51, subd. (c); all undesignated statutory references are to this code.)

The question here is whether hospitals have a duty, beyond what is required by the relevant statutory and regulatory scheme, to notify emergency room patients that they will be charged EMS fees. Plaintiff Taylor Capito argues they do. She filed a class action suit against San Jose Healthcare System, LP, also known as Regional Medical Center San Jose (Regional), challenging the assessment of EMS fees for two emergency room visits. Capito does not dispute that Regional complied with all relevant disclosure obligations, including listing the EMS fees in the chargemaster. She also does not

1

allege that the EMS fees were excessive or that she was charged for services not rendered. Instead, she claims that Regional has a duty not only to disclose EMS fees in the chargemaster, but also to provide notice of those fees before services are provided to emergency room patients, such as through "posted signage in the emergency room, on its website, and/or during the patient registration process." Regional's failure to do so, Capito argues, constitutes an "unlawful, unfair or fraudulent business" practice under the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and violates the Consumers Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.). The trial court and the Court of Appeal rejected Capito's claims.

We agree with the courts below. Hospitals do not have a duty under the UCL or CLRA, beyond their obligations under the relevant statutory and regulatory scheme, to disclose EMS fees prior to treating emergency room patients. Requiring such disclosure would alter the careful balance of competing interests, including price transparency and provision of emergency care without regard to cost, reflected in the multifaceted scheme developed by state and federal authorities. Capito has not sufficiently alleged facts showing that the lack of such disclosure is "unlawful, unfair or fraudulent" on any theory she presents under the UCL or CLRA. Accordingly, we affirm the Court of Appeal's judgment.

## I.

Because "emergency medical care is a vital public service" that "is necessary for the protection of the health and safety" of all, its provision and pricing have long been subject to extensive regulation. (Stats. 1987, ch. 1240, § 1, p. 4406; see § 1339.50 et seq.; § 1317; 42 U.S.C. § 1395dd (Federal Emergency Medical

Treatment and Active Labor Act; EMTALA).) Under state and federal law, qualifying hospitals must provide emergency care "to any person requesting the services or care, or for whom services or care is requested, for any condition in which the person is in danger of loss of life, or serious injury or illness." (§ 1317, subd. (a); see 42 U.S.C. § 1395dd [same].) "In no event shall the provision of emergency services and care be based upon, or affected by, the person's . . . insurance status, economic status, [or] ability to pay." (§ 1317, subd. (b); see 42 U.S.C. § 1395dd(h); 42 C.F.R. § 489.24(a)(1) (2024) [Medicare hospitals must provide emergency care "regardless of ability to pay"].) California law "requires" emergency care providers to stabilize patients "without first questioning the patient's ability to pay. [Citation.] Federal law is similar. (42 U.S.C. § 1395dd[, subd. (h)]; [citation].)" (*Prospect Medical Group, Inc. v. Northridge Emergency Medical Group* (2009) 45 Cal.4th 497, 504; see 42 C.F.R. § 489.24(d)(4)(i)–(ii) (2024).) Federal law also prohibits emergency room registration procedures that "may . . . unduly discourage individuals from remaining for further evaluation." (42 C.F.R. § 489.24(d)(4)(iv) (2024).)

With regard to pricing, California hospitals must make publicly available their chargemasters — "a uniform schedule of charges represented by the hospital as its gross billed charge for a given service or item, regardless of payer type." (§ 1339.51, subd. (b)(1); see *id.*, subds. (a)–(c); 42 U.S.C. § 300gg-18(e) ["Each hospital operating within the United States shall for each year establish (and update) and make public (in accordance with guidelines developed by the Secretary) a list of the hospital's standard charges for items and services provided by the hospital."]; 45 C.F.R. § 180 (2024) [providing guidelines].) In addition, California hospitals must file their chargemasters

with the state's Department of Health Care Access and Information (HCAI), previously called the Office of Statewide Health Planning and Development (OSHPD). (§ 1339.55; see Assem. Bill No. 133 (2021–2022 Reg. Sess.) § 31.) They must also "compile a list of 25 common outpatient procedures and shall submit annually to [HCAI] a list of its average charges for those procedures." (§ 1339.56, subd. (a).) HCAI publishes the list on its website. (*Ibid.*) Hospitals must also furnish this list of 25 common procedures to "any person upon request." (§ 1339.56, subd. (c).) Further, Medicare participating hospitals must " 'post standard charges for at least 300 shoppable services that can be planned in advance.' " (*Gray v. Dignity Health* (2021) 70 Cal.App.5th 225, 233 (*Gray*); 84 Fed.Reg. 65564, 65571 (Nov. 27, 2019).)

These lists, like the chargemaster, must comply with a variety of submission, formatting, and other requirements. (See, e.g., 45 C.F.R. §§ 180.20–180.60; HCAI, Chargemaster Submission Guide <https://hcai.ca.gov/wp-content/uploads/2023/05/Chargemaster-Submission-Guide-_-ADA.pdf> [as of Dec. 23, 2024] (HCAI Guide); all Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.) Every listed service must be labeled with a description, charge, and code, typically a Current Procedural Terminology (CPT) code. (HCAI Guide; 45 C.F.R. 180.60(b)(8) (2024).) "CPT codes are standardized five-digit numeric codes established by the American Medical Association. They are used by health care providers to quickly describe to insurers the services for which the provider is billing." (*People ex rel. State Farm Mutual Automobile Ins. Co. v. Rubin* (2021) 72 Cal.App.5th 753, 764.)

Evaluation and management services "provided in the emergency department" are assigned five different CPT codes. (72 Fed.Reg. 66790 (Nov. 27, 2007); see *id.* at p. 66789 [listing the CPT codes]; HCAI, AB 1045 Template for Reporting 25 Most Common Procedures <https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fhcai.ca.gov%2Fwp-content%2Fuploads%2F2024%2F05%2F25-Common-Optional-Reporting-Form-Template-2024-1.xlsx> [as of Dec. 23, 2024] (HCAI Reporting Template).) Each code "reflect[s] the activities of physicians and do[es] not . . . fully describe the range and mix of services provided by hospitals during visits of clinic and emergency department patients." (72 Fed.Reg. 66790 (Nov. 27, 2007).) These services must be medically necessary and can include preparing "to see the patient (like review of tests)," reviewing medical history, "[o]rdering medications, tests, or procedures," "[r]eferring and communicating with other health care professionals," "[d]ocumenting clinical information in the electronic or other health record," and engaging in various levels of medical decision-making. (Centers for Medicare and Medicaid Services, Evaluation and Management Services Guide (Sept. 2024) p. 15 <https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/eval-mgmt-serv-guide-ICN006764.pdf> [as of Dec. 23, 2024] (CMS EMS Guide); see *id.* at pp. 13–15, 17.) Thus, each code relates "the intensity of hospital resources to the different levels of effort represented by the codes." (72 Fed.Reg. 66805 (Nov. 27, 2007); HCAI Reporting Template, *supra* [describing the levels as ranging from "straightforward" to "high level"].)

Beyond these obligations, "the Hospital Fair Pricing Act (§ 127400 et seq.) requires California hospitals to establish, give

notice of, and administer financial aid and charity care policies. (§ 127405, subd. (a)(1)(A).)" (*Gray, supra*, 70 Cal.App.5th at p. 231.) And "[f]or a person without health coverage, a hospital shall provide the person with a written estimate of the amount the hospital will require the person to pay for the health care services, procedures, and supplies that are reasonably expected to be provided . . . . In addition to the estimate, the hospital shall provide information about its financial assistance and charity care policies . . . . The hospital shall also provide the person with an application form for financial assistance or charity care." (§ 1339.585.) These duties to the uninsured, however, "shall not apply to emergency services provided to a person pursuant to Section 1317." (*Ibid.*)

## II.

"This case comes to us on appeal from the trial court's sustaining of a demurrer. For purposes of reviewing a demurrer, we accept the truth of material facts properly pleaded in the operative complaint, but not contentions, deductions, or conclusions of fact or law. We may also consider matters subject to judicial notice." (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924.) "Accordingly, we assume the truth of the allegations in [Capito's] second amended complaint." (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1230.)

In June 2019, Capito was treated twice at Regional's emergency department. During the visits, Capito signed Regional's "Conditions of Admission and Consent for Outpatient Care" (COA) form. The COA contained a "Financial Agreement" that required Capito to "pay the Patient's account at the rates stated in the hospital's price list (known as the 'Charge Master') effective on the date the charge is processed for the service

provided, which rates are hereby expressly incorporated by reference as the price term of this agreement to pay the Patient's account." (Boldface omitted.) The Financial Agreement also noted: "Some special items will be priced separately if there is no price listed on the Charge Master. An estimate of the anticipated charges for services to be provided to the Patient is available upon request from the hospital. Estimates may vary significantly from the final charges based on a variety of factors, including, but not limited to, the course of treatment, intensity of care, physician practices, and the necessity of providing additional goods and services." Capito also initialed part of the COA that stated she had "been given the opportunity to read and ask questions about the [COA], specifically including but not limited to the financial obligation's provisions." (Boldface omitted.)

Before discounts, Capito's bills for her two emergency room visits totaled $41,016. Each bill included a " 'Level 4' Evaluation and Management Services Fee" of $3,780. Applying adjustments and discounts, Regional reduced her bills to $8,855.38. Capito alleges she "was shocked and dismayed" by the EMS fee. The COA did not specifically reference the EMS fee, and Capito "received no notice or warning, in posted signage in the emergency room or at the registration window/desk, [or] verbally at the time of registration," about the EMS fee. According to Capito, had she been so warned about the EMS fee, she would have left Regional "and sought less expensive treatment elsewhere."

Regional charges EMS fees at one of five levels after a patient is discharged, based on a formula or algorithm undisclosed to patients. As with the standardized CPT codes discussed above, the five levels reflect the intensity of resources

7

used to treat the patient, who may be facing anything from a minor ailment to a complex, life-threatening emergency. Regional discloses the EMS fees in its chargemaster and in its list of 25 most common procedures, both of which Regional has filed with HCAI. Regional charged the following EMS fees in 2019: Level 1 ($672); Level 2 ($1,660); Level 3 ($2,836); Level 4 ($3,780); and Level 5 ($5,635). The Level 4 EMS fee that Capito was charged for each of her visits was described in the list of 25 most common procedures as "high severity without signi[f]icant threat." According to Capito, Regional charges each emergency room patient the EMS fee "simply for seeking treatment in Hospital's emergency room and is designed to cover various 'overhead' type expenses of operating an emergency room which are not billed individually."

Capito filed a class action complaint against Regional in June 2020, which she amended shortly thereafter. She alleged violations of the CLRA on the ground that Regional failed to provide emergency room patients sufficient notice of the EMS fee. Regional demurred and moved to strike the class allegations. The trial court overruled the demurrer but granted Regional's motion to strike the class allegations, finding that issues of reliance and materiality in this case would be too individualized for class treatment. Capito appealed the latter ruling.

Meanwhile, Capito filed her second amended complaint in March 2021, repeating the CLRA claims that survived demurrer. Capito alleged two additional causes of action, one for declaratory judgment and injunctive relief under Code of Civil Procedure section 1060 and one for violation of the UCL. Capito's "[c]omplaint is not that [Regional] fails to list an EMS Fee as a line item in the Hospital's published Chargemaster, or

that [Regional] fails to list the price of such EMS Fees in the Hospital's Chargemaster, but rather the fact that [Regional] gives no notification or warning that it charges a separate EMS Fee for an emergency room visit. As a result, emergency room patients end up being surprised by a substantial charge added to their bill that they were not expecting and did not agree to pay. This separate charge is not mentioned or disclosed in [the COA]." She also alleged that the EMS fees, which were "basically designed to cover the overhead and Hospital's general staffing, administrative, equipment, and supply costs incurred in operating an emergency room," would have been "a substantial factor" in whether a patient would seek care at Regional or elsewhere. Regional again demurred, and this time the trial court sustained the demurrer without leave to amend.

The Court of Appeal affirmed. It followed the reasoning in *Gray, supra,* 70 Cal.App.5th 225 and *Saini v. Sutter Health* (2022) 80 Cal.App.5th 1054 (*Saini*), both of which held that hospitals do not have a duty to disclose EMS fees to emergency room patients beyond what is required by the relevant statutory and regulatory framework. As in *Gray* and *Saini*, the Court of Appeal in this case found it prudent to take a "deferential approach to the legislative and regulatory determinations of what constitutes requisite notice of the costs of emergency medical services." It concluded that Capito's demand for notice could not form the basis of a CLRA or UCL claim because it exceeded and displaced the legislative and regulatory requirements. The Court of Appeal also affirmed the trial court's order striking the class allegations in Capito's first amended complaint.

We granted review in light of a split among the Courts of Appeal. (Compare *Gray, supra,* 70 Cal.App.5th 225 [finding no

duty to disclose EMS fees beyond what is required by the statutory and regulatory scheme]; *Saini, supra,* 80 Cal.App.5th 1054 [same]; *Moran v. Prime Healthcare Management,* Inc. (2023) 94 Cal.App.5th 166, review granted and held Nov. 1, 2023 (*Moran*) [same] with *Naranjo v. Doctors Medical Center of Modesto, Inc.* (2023) 90 Cal.App.5th 1193 (*Naranjo*), review granted and held July 26, 2023 [rejecting *Gray* and *Saini*]; *Torres v. Adventist Health System/West* (2022) 77 Cal.App.5th 500 (*Torres*) [holding that nondisclosure of EMS fees could be actionable under the CLRA].)

## III.

Capito argues that Regional has a duty to warn emergency room patients about EMS fees "prior to providing treatment triggering such a charge" separate and apart from disclosing those fees in the mandated pricelists. She claims that Regional's nondisclosure of the fees in the emergency room is unfair, unlawful, and fraudulent in violation of the UCL and CLRA. We are unpersuaded. The "California Legislature, the United States Congress, and numerous rulemaking bodies have already decided what pricing information to make available in a hospital's emergency room. Just as importantly, they have decided what *not* to include in those requirements. The reason for this extensive statutory and regulatory scheme is to strike a balance between price transparency and dissuading patients from avoiding potentially life-saving care due to cost." (*Moran, supra,* 94 Cal.App.5th at p. 186.) We hold that neither the UCL nor CLRA requires further disclosure of EMS fees beyond what the regulatory scheme requires.

## A.

We first consider Capito's claim that Regional's failure to inform patients of the EMS fee in the emergency room before services are provided is "unfair" under the UCL.

The UCL's scope is "broad." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 (*Cel-Tech*).) "[I]t does not proscribe specific practices. Rather, as relevant here, it defines 'unfair competition' to include 'any unlawful, unfair or fraudulent business act or practice.' ([Bus. & Prof. Code, § 17200].) Its coverage is 'sweeping, embracing " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' " (*Ibid.*, fn. omitted.) "By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Ibid.*) "However, the law does more than just borrow. The statutory language referring to 'any unlawful, unfair *or* fraudulent' practice . . . makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. 'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition — acts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." ' " (*Ibid.*)

The UCL does not define "unfair," and the "standard for determining what business acts or practices are 'unfair' in consumer actions under the UCL is currently unsettled. (See *Aleksick v. 7-Eleven, Inc.* (2012) 205 Cal.App.4th 1176, 1192

11

[public policy that is predicate for action must be tethered to specific constitutional, statutory or regulatory provisions]; *Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 539 [applying balancing test but also examining whether practice offends established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers]; *Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403 [consumer injury must be substantial and neither outweighed by countervailing benefits nor avoidable by consumers]; *Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 285 [(*Progressive West*)] [impact of the act or practice on victim is balanced against reasons, justifications and motives of the alleged wrongdoer].)" (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 380, fn. 9; see also *Nationwide Biweekly Administration, Inc. v. Superior Court* (2020) 9 Cal.5th 279, 303.) We have no need to decide the UCL standard for "unfair" business conduct here. Capito alleges only that Regional's "practices offend established public policies, and are immoral, unethical, oppressive, and unscrupulous." Like the Court of Appeal, we believe Capito has failed to show that Regional's conduct is "unfair" under these standards.

Capito claims that Regional's nondisclosure of the EMS fee to emergency room patients contravenes the public policy in favor of price transparency. She contends that to the extent the Payers' Bill of Rights and EMTALA have any relevance to her claims, they support the view that Regional has a duty to disclose the EMS fee. She notes that these laws embody "the importance of, and need for, greater hospital pricing transparency, with the benefits of promoting competition and reducing medical costs." (See 84 Fed.Reg. 65524–65528 (Nov.

27, 2019) [public comments to and responses from federal regulators discussing the same].)  Referring to Assembly Bill No. 1627 (2003–2004 Reg. Sess.), Capito argues that the Legislature enacted the Payers' Bill of Rights "to discourage hospitals from playing games with hospital pricing in a way that gouges private payers and patients."  She also cites the federal government's "concern[] that challenges continue to exist for patients due to insufficient price transparency," such as "patients being surprised by facility fees and physician fees for emergency department visits."  (83 Fed.Reg. 41686 (Aug. 17, 2018).)

To be sure, price transparency in healthcare is a significant concern under state and federal law.  The Legislature has imposed extensive chargemaster and price list obligations on hospitals "to increase the transparency in hospital pricing to enable consumers to comparison shop for medical services," and federal regulators have done the same.  (*Gray*, *supra*, 70 Cal.App.5th at p. 229; 84 Fed.Reg. 65564, 65571 (Nov. 27, 2019).)  But price transparency is not the only concern.  As discussed, state and federal laws also seek to ensure that emergency medical care is promptly provided to those who need it and that "[i]n no event shall the provision of emergency services and care be based upon, or affected by, the person's . . . insurance status, economic status, [or] ability to pay."  (§ 1317, subd. (b); see 42 U.S.C. § 1395dd(h); 42 C.F.R. § 489.24(a) (2024).)  Hospitals are required to stabilize patients before discussing costs or ability to pay (§ 1317, subd. (d); 42 U.S.C. § 1395dd, subd. (h); 42 C.F.R. § 489.24(d)(4)(ii) (2024)), and the only cost notice required in the emergency room is a sign informing patients of the availability of the hospital's chargemaster (§ 1339.51, subds. (a), (c); 84 Fed.Reg. 65536 (Nov.

27, 2019)). "Together, this multifaceted statutory and regulatory scheme reflects a strong legislative policy to ensure that emergency medical care is *provided immediately* to those who need it, and that billing disclosure requirements are not to stand in the way of this paramount objective." (*Gray, supra*, 70 Cal.App.5th at p. 241.)

Indeed, the Legislature specifically exempted emergency rooms from mandatory, specific disclosures of costs to uninsured patients — individuals who would arguably benefit the most from additional disclosures of EMS fees. As noted, section 1339.585 requires that "[f]or a person without health coverage," hospitals must provide "a written estimate of [costs] for the health care services, procedures, and supplies that are reasonably expected to be provided," but it says this disclosure requirement "shall not apply to emergency services provided to a person pursuant to section 1317." This exclusion allows hospitals to implement "reasonable registration processes" in emergency rooms without "unduly discourag[ing] individuals from remaining for further evaluation," as required by federal law. (42 C.F.R. § 489.24(d)(4)(iv) (2024).) "It is also telling that in expanding the pricing disclosure obligations of hospitals under the Affordable Care Act, federal regulators took care to ensure that these new obligations do not interfere with the emergency treatment obligations under the EMTALA. . . . [T]he new pricing disclosure requirements are focused on 'shoppable' medical services, that is, services that can be scheduled in advance and, by definition, are not emergency medical services." (*Gray, supra*, 70 Cal.App.5th at p. 241; see *Saini, supra*, 80 Cal.App.5th at pp. 1062–1063.)

Capito claims that neither the Legislature nor federal authorities actually engaged in any "carefully considered

'balancing' " of competing interests.  As to section 1339.585, she argues that the Legislature exempted emergency rooms from mandatory cost disclosures for uninsured patients "not because the Legislature wished to conceal pricing information from emergency care patients" but because it is "simply not feasible" to provide "a reasonable estimate of the costs of diagnosis and treatment for an unknown medical condition."  By contrast, Capito contends that hospitals could disclose EMS fees through a "simple, prominent sign placed in [the] emergency room."

Quoting *Gray*, the Court of Appeal observed that " '[a]s originally introduced,' " section 1339.585 " 'required hospitals to provide an estimate of charges upon the request of any patient — including those receiving care in the emergency department.  [Citation.]  As the bill moved through the legislative process, it was amended first to apply only to non-emergency patients [citation] and then amended again to apply only to uninsured persons.' "  Capito disputes this account of the legislative history, claiming that section 1339.585 never applied to emergency room patients because, as originally drafted, it applied only " '[u]pon admission of a patient' " and emergency room patients are typically "outpatient" and not "admitted."  In response, Regional points to a legislative finding that uses the phrase "admitted to an emergency room."  (§ 1596.846, subd. (a)(4).)  But whether or not emergency room patients are "admitted," the fact is that the Legislature ultimately amended section 1339.585 to explicitly exempt emergency rooms.  (Stats. 2005, ch. 532, § 3.)  The possibility that the Legislature may have exempted emergency rooms from section 1339.585 since its inception does not disprove that the Legislature engaged in a balancing of competing interests.  If anything, it suggests that the Legislature has always intended for patients to access

emergency care without being deterred by cost. This point is reinforced by section 1339.585's express reference to section 1317, which says that "the provision of emergency services [cannot] be . . . affected by . . . economic status [or] ability to pay." (§ 1317, subd. (b).)

Capito's claim that federal authorities did not engage in a balancing of competing interests is also unpersuasive. "[W]hen concern was raised that the new federal disclosure requirements might interfere with a hospital's obligations under the EMTALA — including providing emergency treatment to *any* person who seeks it and providing such treatment *before* any discussion about ability to pay" — federal regulators clarified that " '[t]he price transparency provisions . . . do not require that hospitals post any signage or make any statement at the emergency department regarding the cost of emergency care or any hospital policies regarding prepayment of fees or payment of co-pays and deductibles.' " (*Gray*, *supra*, 70 Cal.App.5th at p. 241, quoting 84 Fed.Reg. 65536 (Nov. 27, 2019).) In sum, state and federal lawmakers have considered and declined to impose the additional duty Capito urges here.

At a minimum, it is plausible that a duty to provide such disclosures would risk discouraging patients from seeking emergency care or would put patients in the position of evaluating for themselves whether emergency services, at a particular cost, are warranted in a given circumstance. Capito's emphasis on patient choice presumes that emergency room patients "can accurately diagnose whether their ailment is 'relatively minor' and whether they can safely transport themselves or be transported to a lower acuity facility." (*Gray*, *supra*, 70 Cal.App.5th at p. 242.) It also contemplates that patients will weigh cost against the necessity or value of

emergency care, which the regulatory scheme seeks to discourage. (See § 1317, subd. (b); 42 U.S.C. § 1395dd(h); 42 C.F.R. § 489.24(a) (2024).)

Even if we were to focus on price transparency to the exclusion of competing considerations, we are doubtful that a posting of five possible EMS fees — which run from $672 to $5635 depending on the severity of the patient's condition — would provide reliable notice of actual costs. First, it is questionable whether such a broad range would inform patient choice when hospitals do not know which level will be charged prior to treatment. Second, the EMS fee is only one of many charges an emergency room patient may incur. Capito's total charges amounted to $41,016, the bulk of which — $33,456 — were not EMS fees. Third, the patient's ultimate burden may depend on the availability of insurance or discounts. After adjustments and discounts, Capito's final bill was reduced to $8,855.38. As amici curiae hospital operators note, "disclosure of a hospital's standard charges for EMS Fees would be misleading because virtually no patients are required to pay the full amount of the EMS Fee."

We therefore hold that where a hospital has complied with state and federal disclosure requirements, including listing EMS fees in the chargemaster and informing emergency room patients of the availability of the chargemaster, the lack of further disclosure of EMS fees to such patients in the emergency room before treatment is not "unfair" under the UCL. Capito has not sufficiently alleged that Regional's conduct is "unfair" for violating established public policy or for being immoral, unethical, oppressive, or unscrupulous. She acknowledges that Regional complied with the relevant statutory and regulatory obligations. She does not allege that the chargemaster did not

list the EMS fees or that she otherwise had no way to access information about them. Nor does she allege that she inquired about costs, including the EMS fee, or that Regional denied her the information or the opportunity to inquire about it. To the contrary, she admits she was given the chance to ask about her financial obligations at registration. In sum, we conclude that Capito has not demonstrated unfairness under the UCL based on the allegations in her complaint.

Finally, Capito claims that the Court of Appeal's holding improperly provided hospitals a safe harbor from UCL liability. (See *Naranjo*, *supra*, 90 Cal.App.5th at pp. 1216–1218.) We have said that to create a safe harbor from UCL liability, legislation "must actually 'bar' the action or clearly permit the conduct." (*Cel-Tech*, *supra*, 20 Cal.4th at p. 183.) Thus, "acts may, if otherwise unfair, be challenged under the unfair competition law even if the Legislature failed to proscribe them in some other provision." (*Ibid*.) But whether or not the statutory scheme here creates a safe harbor, we find the scheme relevant to discerning whether Regional's conduct "offends an established public policy" or is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers" (*id*. at p. 184) — that is, whether Regional's conduct is "unfair" under the UCL, applying the standard stated by Capito. Because we hold that it is not, we have no need to decide whether the statutes governing hospital price disclosure create a safe harbor within the meaning of *Cel-Tech*.

## B.

Capito claims that Regional violated the CLRA because it has "exclusive knowledge" of the material fact that an EMS fee would be charged to her, and that she had no way of knowing

about that fact. This violation, Capito argues, forms the basis for an "unlawful" UCL claim. As noted, "[b]y proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Cel-Tech*, *supra*, 20 Cal.4th at p. 180.)

The CLRA aims "to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." (Civ. Code, § 1760.) It specifically "set[s] forth a list of unlawful 'methods of competition and unfair or deceptive acts or practices' (*id.*, § 1770)." (*McGill v. Citibank, N.A.* (2017) 2 Cal.5th 945, 954.) Capito alleges that Regional's nondisclosure of EMS fees amounts to an omission or concealment that "[r]epresent[s] that goods or services have . . . characteristics, ingredients, uses, benefits, or quantities that they do not have" (Civ. Code, § 1770, subd. (a)(5)) and "[r]epresent[s] that a transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law" (*id.*, subd. (a)(14)).

The parties dispute whether a failure to disclose is actionable under the CLRA. (Compare *Naranjo*, *supra*, 90 Cal.App.5th at pp. 1209, 1215–1216 [recognizing that failure to disclose material facts can form the basis of CLRA liability and collecting cases] with *Torres*, *supra*, 77 Cal.App.5th at p. 509 with *id.* at p. 515 (conc. opn. of Poochigan, Acting P. J.) ["omission-based liability under the CLRA" is an "extra-statutory expansion"].) Capito relies on *Naranjo*'s assertion that there is a duty to disclose "when the defendant has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff" or "when the defendant actively conceals a material fact." (*Naranjo*, at pp. 1209–1210.)

Regional argues that the CLRA does not apply because Capito never alleged that the services she received were misdescribed or that the COA contained misrepresentations.

Assuming that a failure to disclose can trigger CLRA liability (an issue we do not decide), we conclude that Capito's allegations do not establish that Regional's conduct was unlawful. Regional disclosed the EMS fees in the chargemaster and in its list of 25 common procedures. It submitted both pricelists to HCAI, which published them on its website. Regional labeled and briefly described the fees using standardized billing codes and guidelines set by state and federal regulators and widely used across the industry. (See HCAI Guide, *supra*; HCAI Reporting Template, *supra*; see also 72 Fed.Reg. 66790 (Nov. 27, 2007) [designated CPT codes reflect "the activities of physicians and do not necessarily fully describe the range and mix of services" rendered in the provision of emergency care]; CMS EMS Guide, *supra*, at pp. 13–24 [providing examples of qualifying services]; 80 Fed.Reg. 70448 (Nov. 13, 2015) ["[s]ince April 7, 2000" federal regulators "instructed hospitals to report" EMS fees using the designated CPT codes]; § 1339.56 [adopting federal diagnostic groupings in pricelist requirements].) Additionally, Regional expressly referenced the chargemaster in the COA that Capito signed, and Regional provided her with the opportunity to inquire about potential costs during registration. Regional also made its chargemaster available, either electronically or physically, at the emergency room and had the requisite "conspicuous" signs saying so. (§ 1339.51, subd. (c); see also *id.*, subd. (a).)

Capito claims that the chargemaster, which lists "tens of thousands of individual billable items" and uses abbreviated descriptors, essentially hides the EMS fee and provides no

notice that it would be charged. But Regional's chargemaster lists each EMS fee as a line item with the prescribed CPT code, standard charge, and the texts "LVL" and "EMER DEPT." (See, e.g., HCAI Guide, *supra*, at p. 1; HCAI Reporting Template, *supra*; *Gray*, *supra*, 70 Cal.App.5th at p. 235.) This alone suffices to demonstrate that, contrary to Capito's claims, Regional neither had "exclusive knowledge" of the fact that an EMS fee would be charged nor "actively conceal[ed]" that fact. (*Naranjo*, *supra*, 90 Cal.App.5th at pp. 1209–1210.)

It is notable that Regional also provides notice of EMS fees through its list of 25 most common procedures, filed with and published by HCAI. That list is much shorter and begins at the very top with the heading "Evaluation & Management Services (CPT Codes 99201–99499)," followed by several lines with the words "Emergency Room Visit" and corresponding "average charge[s]" based on the severity of the patient's condition. These descriptors exceed HCAI's guidelines and are almost identical to what Capito says would be adequate. For example, Regional lists the $3,780 EMS fee charged to Capito with the standard CPT code 99284 and the text "Emergency Room Visit, Level 4 (high severity without signi[f]icant threat)." (Compare HCAI Reporting Template, *supra* ["Emergency Room Visit (moderate level) 99284"].) Capito demands signage that says "EMERGENCY DEPARTMENT VISIT FEES [¶] . . . [¶] Level 4 (CPT code 99284: severe) $3,780.00." Capito's complaint does not indicate how the published descriptors, which closely resemble her own proposed signage, are deficient in informing her of Regional's intent to charge the EMS fee.

Capito insists that the EMS fee line items do not inform "an objectively reasonable person" of the " 'circumstances in which the EMS Fee is charged.' " To be sure, the average patient

21

would not know of the term "evaluation and management services." But that does not mean Regional had exclusive knowledge of the fact that it charges a fee for the evaluation and management of emergency room patients. A reasonable person would likely know that getting evaluated in a hospital emergency room is not free. In the emergency room context, medical professionals "must make instantaneous decisions, often without the benefit of" an established relationship, "medical histories, consultation, or time for reflection." (*James v. St. Elizabeth Community Hospital* (1994) 30 Cal.App.4th 73, 81.) A reasonable person would infer that evaluation services — for example, a physician's preliminary examination of the patient or review of medical history (CMS EMS Guide, *supra*, at pp. 12–13) — incur some cost.

For largely the same reasons that Capito's allegations do not establish that Regional had "exclusive knowledge" of the fact that she would be charged an EMS fee, they also do not establish that this fact was not "reasonably accessible" to her. (*Naranjo*, *supra*, 90 Cal.App.5th at pp. 1209–1210.) Capito alleges that "at least during part of the Class Period," such as on July 20, 2020 (a year after her emergency visits), the link to the chargemaster on Regional's website was "dead." Even if true, there is no dispute that Regional complied with its obligations by either posting the chargemaster on its website or having an electronic or physical copy in the emergency room. (§ 1339.51, subd. (a).) And there is no allegation that the chargemaster was not filed with HCAI or that it was unavailable on HCAI's website. Further, by signing the COA form, Capito acknowledged she had "been given the opportunity to read and ask questions about the [COA], specifically including but not limited to the financial obligation's provisions." (Boldface omitted.) Because there were

various ways to access the information, and because Capito does not allege she was unable to gain access even if Regional's website was dead during part of the class period, her claim that Regional "did not make its Chargemaster . . . reasonably available to emergency room patients" is not adequately supported by specific allegations.

In sum, even if a failure to disclose can give rise to CLRA liability in the manner described in *Naranjo,* Capito has not alleged facts showing that Regional's conduct was "unlawful" by virtue of Regional having exclusive knowledge of the EMS fee or Capito lacking reasonable access to the information. We hold that Capito has not sufficiently alleged a violation of the CLRA and thus her UCL "unlawful" claim fails.

## C.

Finally, Capito says Regional's nondisclosure of EMS fees is a "fraudulent" or "deceptive" business practice under the UCL. "The fraudulent business practice prong of the UCL has been understood to be distinct from common law fraud." (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 312.) "Historically, the term 'fraudulent,' as used in the UCL, has required only a showing that members of the public are likely to be deceived." (*Daugherty v. American Honda Motor Co., Inc.* (2006) 144 Cal.App.4th 824, 838; see *Moran, supra,* 3 Cal.App.5th at p. 185.) This court has not defined the standard for deception by omission or failure to disclose under the UCL's fraudulent prong, and we express no view here. It suffices to say that Regional's conduct, for the reasons above, is unlikely to deceive the public. Its compliance with the regulatory scheme promotes price transparency for consumers to the extent contemplated by state and federal authorities, who sought to balance that

concern against the risk of dissuading patients from seeking emergency care.

At bottom, Capito desires notification of the EMS fee as if emergency care were a shoppable service. She does not believe Regional's notices about its intent to charge the EMS fee — provided in legally mandated pricelists and in a similar fashion that Capito apparently finds suitable for other services — adequately promotes price transparency and informed decision-making. But Regional need not provide " 'the best possible notice' " to avoid liability under the UCL. (*Nolte v. Cedars-Sinai Medical Center* (2015) 236 Cal.App.4th 1401, 1409.) This is especially so when state and federal lawmakers, who are "better situated than we are to tackle the '[s]ignificant policy judgments affecting social policies and commercial relationships' implicated in this case" (*Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal.5th 905, 948), have already made a reasoned determination of what constitutes sufficient notice in the emergency room context in light of competing concerns. We see no basis to conclude that the public will likely be deceived by the form and extent of Regional's disclosures in accordance with relevant state and federal regulations.

## CONCLUSION

We affirm the Court of Appeal's judgment and hold that hospitals do not have a duty under the UCL or CLRA, beyond what is required by the statutory and regulatory scheme, to disclose emergency room EMS fees. We also dismiss as moot Capito's appeal from the trial court's order striking her class allegations. We disapprove *Torres*, *supra*, 77 Cal.App.5th 500

and *Naranjo, supra*, 90 Cal.App.5th 1193 to the extent they are inconsistent with this opinion.

**LIU, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Capito v. San Jose Healthcare System, LP

_____

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 4/6/23 – 6th Dist.
**Rehearing Granted**

_____

**Opinion No.** S280018
**Date Filed:**  December 23, 2024

_____

**Court:**  Superior
**County:**  Santa Clara
**Judge:**  Sunil R. Kulkarni

_____

**Counsel:**

Law Offices of Barry L. Kramer, Barry L. Kramer; Carpenter Law and Gretchen Carpenter for Plaintiff and Appellant.

Rob Bonta, Attorney General, Nicklas A. Akers, Assistant Attorney General, Michele Van Gelderen and Hunter Landerholm, Deputy Attorneys General, for the California Attorney General as Amicus Curie on behalf of Plaintiff and Appellant.

King & Spalding, Glenn Solomon, Paul R. Johnson, Amanda L. Hayes-Kibreab, Ariana E. Fuller and Zuzana Ikels for Defendant and Respondent.

Norton Rose Fulbright US, Jeffrey B. Margulies, Robin D. Ball and Jacqueline C. Karama for Doctors Medical Center of Modesto, Inc., as Amicus Curiae on behalf of Defendant and Respondent.

Manatt, Phelps & Phillips, Barry S. Landsberg, Harvey L. Rochman and Joanna S. McCallum for Dignity Health, Sharp HealthCare and

Providence St. Joseph Health as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Gretchen Carpenter
Carpenter Law
1230 Rosecrans Avenue, Suite 300
Manhattan Beach, CA 90266
(424) 456-3183

Paul R. Johnson
King & Spalding LLP
633 West 5th Street, Suite 1600
Los Angeles, CA 90071
(213) 443-4370